Hon. ROUSSEAU A. BURCH,
Hon. HENRY F. MASON,
Hon. SILAS W. PORTER,
Hon. JUDSON S. WEST,   } Justices.
Hon. JOHN MARSHALL,
Hon. JOHN S. DAWSON,

No 20,943.

THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY, *Appellee,*
v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.*

### SYLLABUS BY THE COURT

1. GRADE CROSSING—*Two Railroads—Interpretation of Contract Concerning Gate.* A contract between the plaintiff and the defendant relating to the erection, operation, and function of a gate at a grade crossing of their railroads at a station, and the operation of trains over the crossing, provided that the normal position of the gate was to be across the plaintiff's track, the purpose being to block the plaintiff's track and allow the defendant's trains to run over the crossing without stopping, except when the gate should be turned across the defendant's track. In that event, the defendant's trains were to respect the signal, and stop. *Held,* the gate might properly be turned in favor of one of the plaintiff's trains after it arrived at the crossing, and against an on-coming train of the defendant, provided sufficient distance were allowed to give timely warning, by means of the gate, so that the on-coming train could be stopped by the exercise of reasonable care.

2. SAME—*Finding—Passenger Train Came to "Full Stop"* The contract required the plaintiff's trains to come to a full stop before passing over the crossing. The jury were asked whether or not the passenger train of the plaintiff, run into while on the crossing by the freight train of the defendant, first came to a full stop. The jury answered, "Yes, approximately so." The answer was based on evidence to the effect that the purpose of a full stop was accomplished. *Held,* the contract was complied with.

3. SAME—*"Employees" to Open and Close Gate at Crossing.* The contract required "employees" of the plaintiff to open and close the gate. Evidence was introduced to show that "employees" meant trainmen, or a trained signal man. Some evidence to the same effect was rejected. The gate was opened by a hackman, acting under authority of the plaintiff's station agent. *Held,* it was not material who performed the physical act of manipulating the structure, and in view of special findings showing the gate was turned against the defendant's train in ample time, it was not material what employee of the plaintiff authorized the signal.

4. SAME—*Company's Rules—Abrogation.* To support its interpretation of the contract, the defendant introduced in evidence a rule of the plaintiff requiring trainmen of the plaintiff to open the gate. *Held,* evidence of abrogation of the rule by the plaintiff, long before the collision, was properly received.

5. SAME—*Interpretation of Company's Rules by Court—Expert Evidence.* The plaintiff introduced in evidence a rule of the defendant requiring its trains to approach grade crossings under full control. Evidence offered on behalf of the defendant that full control had a special, technical meaning, as applied to crossings gated normally against a foreign road, was rejected. Ordinarily, rules of this kind, containing no term the meaning of which is not perfectly clear, are to be interpreted by the court. Sometimes genuinely technical expressions are used, and sometimes the practical application of a rule to a particular state of facts may not be clear. In such cases evidence of how those governed by the rule understand it may be helpful. The court must determine in each instance whether it needs any testimonial aid to interpret the word or phrase in dispute.

6. SAME—*Rules—Evidence, Not Standard of Duty* Rules of the kind referred to are limitations placed by the employer on the conduct of his employees, evidencing what the employer considers proper conduct, and do not establish the legal measure of duty to third persons, which may be greater or less than the rule prescribes.

7. SAME—*Trains Approaching Crossing "Under Full Control"—Instruction.* The court instructed the jury that trains were required to approach the crossing under proper control, and proper control was defined as such control that the train could be stopped promptly if need arose. Under control, under full control, and under proper control, are all relative and not absolute terms, and as applied to the approach of the defendant's freight train, under the circumstances disclosed by special findings of fact, the instruction was not erroneous.

8. SAME—*Special Findings—Liability of Defendant.* Special findings of fact considered, and held to be sustained by the evidence, and to fasten responsibility for the collision on the engineer of the freight train.

9. SAME—*Settlement by Plaintiff of Personal-injury Claims—Reimbursement by Defendant.* The plaintiff paid, for the account of the com-

pany at fault, sums of money in settlement of claims for personal injuries arising from the collision, and for other purposes. *Held*, the letters and telegrams passing between the officials of the two companies authorized the settlements; certain expenditures were incidental to personal-injury claims; the duty of the defendant to reimburse the plaintiff was implied; and the duty arose as soon as settlements were made, so that the sums paid drew interest.

10. SAME—*Duty toward Passengers Not Owed to Other Railroad.* The duty of the plaintiff to exercise extraordinary care toward its passengers was not owed to the defendant, and the principles governing the liability of a carrier to its passengers do not apply to the accountability of the defendant to the plaintiff.

11. SAME—*No Errors in Record.* Other claims of error considered, and decided adversely to the defendant.

Appeal from Coffey district court; WILLIAM C. HARRIS, judge. Opinion filed May 11, 1918. Affirmed.

*W. P. Waggener,* of Atchison, and *J. M. Pleasant,* of Burlington, for the appellant; *J. M. Challiss, George F. DeLacy,* and *Walter E. Brown,* all of Atchison, of counsel.

*W. W. Brown, James W. Reid,* both of Parsons, *John J. Jones,* of Chanute, and *Joe Rolston,* of Burlington, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover sums of money paid for the account of the company at fault, and damages, consequent upon a collision between a passenger train of the plaintiff and a freight train of the defendant. The plaintiff recovered, and the defendant appeals.

The collision occurred at the crossing of the two railroads at the station of Moody, which, with the surroundings, is shown on the appended sketch. The passenger train approached Moody from the northwest. The freight train came from the south, and farther away from the southwest. After the two trains came from behind the hills indicated on the sketch they were visible to each other, and trainmen of each saw the other. The passenger train proceeded to the crossing stop sign, whistled for the crossing, and then proceeded toward the crossing. The crossing is gated, the normal position of the gate being across the plaintiff's track. Before the passenger train

reached the crossing the gate was turned across the defendant's track. The passenger train consisted of an engine, a baggage car, a combination mail and passenger coach, and a passenger coach. The usual stopping place is with the mail car on the crossing. When about to stop the engineer of the passenger train perceived the freight train would not be stopped, and made an effort to clear the crossing. The engine of the freight train struck the passenger coach with tremendous force, inflicting much injury to persons and property. After negotiating with the defendant concerning the matter, the plaintiff settled, for the account of the company at fault, death and personal-injury claims, physicians' and surgeons' bills, bills for nursing and for board of the injured, and paid the expenses incident to such settlements. The plaintiff also paid out sums of money to replace and repair equipment and other property destroyed and injured.

The gate was erected under a contract, the material portions of which read as follows:

"The object and purpose of said gate and signal lamp at Moody is to block the track of the party of the first part [M. K. & T.] and to allow the parties of the second part [Mo. Pac.] to run their trains over said crossing without stopping (except when such gate shall be turned against them, in which case they shall respect the signals and stop their trains) but in no event shall any train be run over said crossing at a speed in excess of fifteen miles per hour. The normal position of said gate shall be across and at right angles to the track of the party of the first part, and the trains of the party of the first part shall be brought to a full stop before passing over said crossing, and the employees of said first party shall open the gate before and close the same after the passing of its trains over said crossing."

In this instance the gate was opened in front of the passenger train, and closed in front of the freight train, by Walter Giesy, a hack driver, who acted under the direction of the station agent.

The plaintiff charged the defendant with negligence in respect to the manner in which the freight train was operated, and in other respects not now material. The defendant denied negligence on its part, and charged the plaintiff with negligence in four particulars: first, the passenger train did not come to a full stop before proceeding over the crossing; second, the gate was not operated by one of the plaintiff's agents, servants, or employees; third, the person who did open the gate did not

Railway Co. v. Railway Co.

look or listen for a train on the defendant's road; fourth, the plaintiff's engineer proceeded over the crossing without looking or listening for a train on the defendant's road.

The defendant's account of the collision, indicated in its answer and detailed in the testimony of its engineer and other witnesses, was this: At the top of the hill southwest of Moody the engineer tested the air, and found the braking appliances of his train in good condition. When about 3,000 feet from the crossing he made a ten-pound air reduction, and held it until he got off the curve and on the straight and level track. This reduced the speed of the train from thirty or thirty-five miles per hour to twenty or twenty-five miles per hour. About 1,500 or 1,600 feet from the crossing he made a second reduction, making twenty pounds in all, which reduced the speed of the train so that when it was within 600 feet of the crossing it was traveling about twelve or fifteen miles per hour. By making a further reduction he could have stopped the train before reaching the crossing. The engineer was on the right side of his engine, and before reaching the straight track was precluded from a view of the crossing. The fireman, however, looked toward the crossing and advised the engineer the track was clear. When the straight track was reached the engineer saw the track was clear. When about 600 feet from the crossing, the track still being clear, he gave two blasts of the whistle —"whistled off"—put his valve at full release, and let loose of the brakes. When he released the air he knew he could not effectively use the air brakes again before reaching the crossing. When he was at the north end of bridge No. 114 (335 feet from the crossing) the gate was thrown in front of him, and at the same time he saw the passenger train come on the crossing. At practically the same time the front brakeman, who was riding on the engine pilot, gave him the stop signal. He immediately made an emergency application of the air, reversed the engine, and opened the sanders. He had no time to do more, and jumped from the engine, as did the fireman and head brakeman.

If the testimony for the defendant had been believed, it would have authorized a verdict for the defendant. It is very clear, however, that only a portion of it was credited by the jury. The jury doubtless believed the engineer's testimony

that when the freight train was 600 feet from the crossing, by a further reduction of air he could have stopped the train before it reached the crossing. The jury found that when he was from 600 to 800 feet from the crossing he could have, with the appliances at hand, stopped before he reached the crossing, and that after the gate was turned he could have stopped before reaching the crossing. The jury doubtless believed that the engineer released his brakes near the place where he said he did, about 600 feet from the crossing, and that by releasing the brakes he knew he lost, for the time, effective air control of his train. The jury doubtless believed the engineer of the freight train saw the gate turned against him, and saw the passenger train go immediately on the crossing. The jury found, however, that the engine of the freight train was from 800 to 1,000 feet from the crossing when the movement of turning the gate across the freight train's track was finished. The jury found the engine of the passenger train was within from twenty to thirty feet of the crossing when the gate was turned, and the passenger train was in full view when the engineer of the freight train released his brakes. The jury found the freight train was moving at the rate of from fifteen to eighteen miles per hour when the gate was turned and when the crossing was reached, found the air was not applied in emergency, and found the reverse lever and sand were not used.

The jury found specially that the passenger train was brought to a full stop, or approximately so, before going on the crossing. The evidence was that this stop was made at the usual place, in the vicinity of the stop board, 176 feet from the crossing. The jury found that as the passenger train approached the crossing from a point 175 feet distant it was at all times under control, that when within 100 feet of the crossing it was moving at the rate of from two to four miles per hour, and could have been stopped within ten feet, that the gate was turned when the engine was within twenty to thirty feet of the crossing, and that the engine was then moving at the rate of four miles per hour. The jury further found that the engineer of the passenger train went on the crossing believing the freight train employees would observe and obey the gate signal to stop; that the engineer of the passenger train was prevented from knowing the freight train would not or

Railway Co. v. Railway Co.

could not stop, because no warning was given; and that after discovering the freight train was beyond control, he made every possible effort to get the passenger train off the crossing. The, findings of fact are appended to this opinion.

As indicated by its answer, the defendant relied on breaches of the gate contract as a defense to the action. Some observations respecting the contract will greatly simplify the discussion by rendering unnecessary separate consideration of a number of assignments of error.

Broadly speaking, the contract embraced three subjects: the function of the gate, the operation of trains at the crossing, and the operation of the gate itself. The gate was a signal. It had two functions: first, and chiefly, to block the plaintiff's track; second, to block the defendant's track. Any train approaching on the plaintiff's track would find the gate closed against it. Normally, a train approaching on the defendant's track would find the track clear, but the gate might be closed against it. A train approaching on the plaintiff's track must be brought to a full stop before going on the crossing. A train approaching on the defendant's track, finding the gate open, may proceed without stopping; finding the gate closed, it must respect the signal, and stop. No train should go, over the crossing at a speed in excess of fifteen miles per hour. Since the gate is normally open to the defendant's trains, and normally closed to the plaintiff's trains, the plaintiff operates it, opening and closing it.

The situation which gives rise to this controversy is not covered by the contract. The defendant has no contract for a clear crossing at all times. The contract provides that when the gate is turned against the defendant's trains they must respect the signal and stop. There is no rule, however, stated in terms or derivable by implication from terms stated, by which to determine when the gate may be opened to allow one of the plaintiff's trains to pass in front of one of the defendant's trains. How shall the matter be determined? The public is interested in two respects, convenience and safety. Each company is a common carrier, serving the public. It is important that traffic be not unnecessarily and unreasonably impeded, and it is important that the legal duty to use due care for the protection of persons and property be observed. If one of the

plaintiff's passenger trains should arrive at the gate when one of the defendant's freight trains is just coming out of the hills southwest of the station, the passenger train ought to open the gate and proceed to dispatch its business at the station. This principle ought to govern so long as the gate may safely be closed against the freight train. If the two trains approach near the same time, the defendant has the right of way. But if the plaintiff's train arrive so far ahead of the other that the other may safely be signalled, by means of the gate, to stop, the other must stop if the signal be given. Because the crossing is a gated crossing at a station, the defendant's trains approach subject to the contingency that the gate may be rightfully closed against them, and they must be operated accordingly.

· The contract was made just before section 8413 of the General Statutes of 1915, relating to the erection of works or fixtures rendering it safe for engines and trains to pass over grade crossings without stopping, became effective. The implication from that statute is that the defendant is obliged to stop its trains for the crossing, even when the gate is in their favor. However that may be, the gate may be turned against them when safety will permit.

The breach of contract first pleaded as a defense was that the passenger train did not come to a full stop. The finding of the jury was to the contrary, the answer to the question whether or not the train came to a full stop being, "Yes, approximately so." (Finding 11, first series.) The argument is made that if the passenger train had come to a full stop, the freight train would have had time to approach so near to the crossing that the gate could not have been safely turned against it. There was abundant testimony that the train actually came to a dead stop. Other testimony was that if all motion did not entirely cease, it would be necessary to observe the wheels very closely to detect the fact. The engineer said he thought he came to a dead stop—if not a dead stop, you would call it a stop, anyway, and he thought it was a dead stop. The jury evidently based its finding on this testimony, and it was clear that so far as practical consequences were concerned the equivalent of a full stop was made.

· The next breach of the contract pleaded in defense was that the gate was not opened by a proper person. The term used

in the contract to designate the persons to operate the gate was "employees." The answer alleged the contract provided that the plaintiff's servants, agents and employees were to open and close the gate, and that the plaintiff failed to have its servants, agents, and employees open the gate. More specifically it was alleged that the plaintiff's servants, agents, and employees failed to operate the gate as provided for in the contract, by permitting other persons who were not in the employ of the plaintiff to operate the gate. On the face of the contract the word "employees" was used, not to designate a particular class of employees, but to fix the burden and responsibility of opening and closing the gate on the plaintiff. When the answer was drawn the defendant understood the contract to distinguish, not between classes of employees, but between representatives of the plaintiff and outsiders. Under the stress of the trial the apparent meaning of the contract and the interpretation of it recognized by the answer were both abandoned, and a third meaning was proposed. The word "employees" became a "technical" term in "railroad circles," and in the contract meant either trainmen or a trained signal man. Evidence was introduced in support of this highly specialized signification, and the evidence was extended to show the duty of a signal man. Some evidence of the latter kind was excluded, but the defendant's general superintendent told the jury what the duty of a signal man is. He said the signal should not be touched unless sufficient distance be allowed for timely warning. At first he said that if both trains were in sight, the signal should not be touched at all. Applying his rule, however, he said that if the plaintiff's train were at the proper place, about 200 feet from the crossing, and the defendant's train were 4,200 feet away, the gate might be turned, but not if the defendant's train were only 1,000 feet away.

In further support of the defendant's interpretation of the contract, the defendant introduced in evidence a rule found in the plaintiff's time card requiring trainmen to open gates blocking the plaintiff's line. The proof was, however, that this rule was dormant, so far as it affected the Moody crossing, and that the agent at Moody was authorized to operate the

gate there. The plaintiff had the right, of course, to show abrogation of one of its own rules.

It will be observed that the governing principle relating to closing the gate in front of one of the defendant's trains, stated by its general superintendent, that sufficient distance should be allowed for timely warning, is essentially the same as the governing principle relating to the same matter stated above. The witness derived his rule from the duties of a signal man. The court derived its rule from the legal duty to use due care.

In the brief of the defendant it is said:

"The object and purpose of the gate at Moody was to permit the appellant to run its trains over the crossing without stopping, unless the gate or signal was against it. Of course, this contract did not contemplate that the gate or signal should be turned against the appellant's trains when they were in such close proximity as to require extreme measures to be resorted to, to bring its train to a stop before reaching the crossing; the only sane construction that could be placed upon that part of the contract is that the gate or signal should only be turned as against the appellant's train when it was a sufficient distance from the crossing so that it could be stopped by the exercise of reasonable and ordinary care on the part of those in charge of the same."

The governing principle here stated is essentially the same as that announced by the court. The defendant's counsel derive their rule from the contract. The court holds the contract is silent on the subject, and derives its rule from the legal duty to use due care.

From the foregoing it is clear the result reached by the defendant's general superintendent, by the defendant's counsel, and by the court, is substantially the same, and, that being true, it is not of the slightest consequence what employee of the plaintiff operated the gate, provided sufficient distance were allowed to give timely warning so that the trainmen could stop the freight train by the exercise of reasonable and ordinary care. The plaintiff had the right to give the signal and stop the freight train, under the conditions stated. It was of no consequence to the engineer of the freight train whether the person who turned the gate on behalf of the plaintiff had just been graduated from a school for signal men, or had just come in from the cornfield. If the conditions stated were met, it was the duty of the engineer to recognize the signal and stop, no matter who acted for the plaintiff. Failing to do so, responsibility for the consequences rested on him. What are the facts?

The jury found the freight train was moving at the rate of from fifteen to eighteen miles per hour when the gate was turned. The plaintiff's engineer testified that in railroading the most important rule is that in case of doubt you must take the safe side, and that he, and any one, would "take the chances" of going on the crossing when the freight train was 800 or 900 feet away and going at the rate of twenty miles per hour. Highly qualified expert witnesses for the defendant, after having been given all the data necessary to an opinion, testified that the freight train could have been stopped by service application of the air in 950 feet when going twenty miles per hour, and in 600 feet when going fifteen miles per hour. The defendant's engineer testified to reducing speed by service applications so that when he was within 600 feet of the crossing he was running at the rate of from twelve to fifteen miles per hour. He then testified that by further reduction he could have stopped before reaching the crossing. On this testimony the jury found specially that the freight train could have been stopped before reaching the crossing after the gate was turned, and could have been stopped before reaching the crossing if the gate had been turned when the engine was from 600 to 800 feet from the crossing. The movement of setting the gate against the freight train was completed when the engine was from 800 to 1,000 feet from the crossing. The result is, the findings of the jury, supported by the defendant's own testimony, show that the gate was properly turned against the freight train, on the defendant's own theory of the case. Not desiring to place the defendant in the attitude of having made concessions, either of law or fact, the court holds that the findings of the jury show the gate was properly turned against the freight train under the principles of law governing the case.

In the course of the trial the plaintiff introduced in evidence a rule promulgated by the defendant for the guidance of its employees, which reads as follows:

"Q-22. All trains must approach drawbridges and railroad crossings at grade under full control. . . . At crossings gated against foreign roads, trains may proceed at reduced speed, without stopping, when line is clear."

The defendant introduced in evidence a rule common to both companies, which reads as follows:

"98. Trains must approach the end of double track, junctions, railroad crossings at grade, and drawbridges, prepared to stop, unless the switches and signals are right and the track is clear."

The defendant undertook to mitigate the apparent restrictive quality of its rule Q-22, and to piece out its contract and claimed right to run the Moody crossing, by offering testimony that the term "full control" has a technical meaning as applied to the operation of railroad trains approaching a crossing gated against a foreign line. Several different statements of this technical meaning were offered. The one chosen by the defendant as its favorite is this: Some of the engine crew must maintain a sharp lookout ahead, and the train must be able to stop within the distance the track is seen to be clear and the line of rails unbroken. In this instance the crossing came within the engineer's vision when he was 1,600 feet or more from it. Applying the rule, if, in case of need, he could stop within that distance, his train would be under full control, and the track having been seen to be clear and the line of rails unbroken for that distance, the crossing would not be regarded as an obstruction. The defendant's general superintendent desired to elucidate the subject as follows:

"Trains must be operated, at a point where the signals come within the range of vision of the engineer, at a speed which would enable those in charge of said train to bring it to a stop within a safe distance from said crossing, in the event the gate and signal were found set against said train."

In short, the claim was that if an engineer can see a clear crossing a mile away, and could stop before reaching the crossing, his train is "under full control," and as one of the defendant's affidavits said, he then releases his brakes, and may go over the crossing at not to exceed the rate permissible at that crossing. The "contract rate," it will be recalled, was fifteen miles per hour.

The court declined to receive some of the evidence tendered, and gave the following instruction relating to the proper method of approaching a crossing of the kind in controversy:

"It is the duty of those in charge of a train approaching such a crossing as the one in question of another line of railway to approach such

crossing with train under proper control the entire distance to such crossing. By proper control is meant under such control that the train can be brought to a stop promptly if need arises, and this is the law regardless of special rules or instructions upon the subject, and a failure to maintain such control is negligence."

On the face of it rule Q-22 is a rule of safety, applicable when and where there is a likelihood of danger. It covers two subjects: first, approach to crossings at grade, and, second, the movement of trains over gated crossings when the crossing has been reached. Approach means to come near to, and does not relate to the operation of trains anywhere else than where danger is to be apprehended. Applied to the freight train in controversy, which, under the circumstances, was obliged to anticipate obstruction of the track by the gate when only 800 feet away, the proposed meaning would determine the question of full control 1,600 feet or more away. On its face, the first portion of the rule is concomitant with rule 98, which means that trains must approach grade crossings prepared to stop, and not proceed unless signals are seen to be right and the track clear. No "technical" meaning of "prepared to stop" was hazarded.

Rules of the kind under consideration are not rules of law. They are merely limitations placed by the employer on the conduct of employees. In relation to third persons they are merely evidence of what the employer considers proper conduct. They do not establish the legal measure of duty to third persons, which may be more or less than the rule prescribes. If a rule be reasonable, a court may declare violation of it to constitute negligence.

Regarding rule Q-22, as a creation of the defendant, having a cryptic meaning concealed by a few common English words simply and grammatically arranged and understood only by the initiated, the court might have permitted the defendant to show what it meant. Ordinarily, rules of this kind, containing no term the meaning of which is not perfectly clear, are to be interpreted by the court. Sometimes genuinely technical expressions are used, and sometimes the practical application of a rule to a particular state of facts may not be clear. In such cases evidence of how those governed by the rule un-

derstand it may be helpful.   The general principle relating to
the reception of such evidence is stated by Wigmore as follows:

> "*Expert interpretation of words or phrases.*   Here it is obvious that
> the interpretation of the meaning of the document in respect to ordinary
> words, being a part of the function of the court  .  .  ., is not for a
> witness to speak to.   But so far as the words are technical, and the wit-
> ness speaks to technical usage or meaning, there is no prohibition; the
> court must determine anew in each instance whether it needs any testi-
> monial aid to interpret the word or phrase in dispute."   (3 Wigmore on
> Evidence, § 1955, p. 2601.)

In this instance the real purpose of the evidence offered was
to establish a general standard of right and duty.   In the light
of the facts found, the meaning contended for would make the
rule void, or at least wholly irrelevant, because it ignored the
obligation resting on the engineer of the freight train to an-
ticipate, under the circumstances, a rightful change of the po-
sition of the signal within half the distance he could see the
crossing.   Consequently prejudicial error was not committed
in rejecting the evidence.

As a matter of fact, the defendant did get its interpretation
of the rule quite clearly before the jury, but the court saw fit
to cover the legal duty involved by the instruction which has
been quoted.   The court based its instruction on the opinion
of the United States circuit court of appeals for this circuit, in
the case of *Kansas City, Ft. S. & M. R. Co. v. Stoner,* 51 Fed.
649, where it was said:

> "Aside from the provisions of any specific rule upon the subject, the
> law requires of parties charged with the control and management of
> trains moving upon intersecting lines of railway that as they approach a
> crossing they must exercise due care to secure the safe passage of the
> train over the same, and in this respect they owe this duty not only to
> those whose persons or property may be upon the train controlled by
> them, but also to those who may be upon the train of the other inter-
> secting line.   In the performance of this duty it is incumbent upon the
> parties in control of the train that they shall exercise a proper lookout
> for the approach of another train, and they must also have their own
> train under proper control, so that if need arises, it can be promptly
> stopped."   (p. 652.)

Under control, under full control, and under proper control,
all come to the same thing in application, and are all relative
and not absolute terms.   A train running free at its highest
rate of speed may be under full control.   Running in a heavy

fog, the engineer of a train should be able to stop it within the distance he can see ahead.  Under a great many circumstances it is sufficient to adjust control to the distance the engineer can see along the track.  The fact that under control and under full control are not absolute but are relative terms accounts for the different meanings which railroad men give them when they attempt to express themselves.  It so happened that early in the trial the engineer of the passenger train was asked to give his judgment as to when a train is under control.  He said, "When a man can stop it in a short distance."  In the case of *Neary et al. v. Northern Pac. Ry. Co. et al.,* 37 Mont. 461, 19 L. R. A., n. s., 446, a rule requiring trains to approach grade grossings prepared to stop, and to approach and pass through yards under full control, was under consideration, and the court said:

"The words 'under full control,' as used in this rule, are understood by railroad men to mean 'ready to stop at any moment; there is danger ahead.'" (p. 471.)

In this instance the court was concerned with the legal duty to be fulfilled at a gated crossing, the gate of which might under certain circumstances, be properly turned against a train normally having a clear track.  The court said that trains should approach that crossing under "proper control," and that proper control meant such control that the approaching train could be brought to a stop promptly should need arise.  Promptly is the adverbial form of the word prompt, which means ready and quick to act as occasion demands (Webster's New International Dictionary).  One of the occasions affecting the freight train in this case was that the gate might rightfully be turned against it.  Therefore, as applied to the facts of this case, the instruction was correct.

It may be assumed that in answering special questions employing the words "full control" the jury understood the words to refer to the proper kind of control described by the court.  That meaning is important, however, in but three special findings, all in the second series—the first, the first part of the third, and the fourth.  Those findings may be eliminated from consideration without affecting the result, and the instruction defining proper control may be eliminated without affecting the result.  Valid findings unaffected by the instruc-

tions clearly establish the situation confronting the engineers of both trains, and the manner in which they dealt with that situation. This court is able to apply to the findings the proper rule of law. For the same reason, various assignments of error relating to expert testimony and instructions regarding the duty of an engineer at a gated crossing do not require individual discussion or mention.

The defense that the person who opened the gate was not an employee of the plaintiff, and did not exercise due care to ascertain if a train were approaching on the defendant's track, needs little further discussion. The agent at Moody was a woman. There was evidence that she was in the habit of asking some one to turn the gate. Who performed the physical act of manipulating the structure for her was of course wholly immaterial. In this instance the evidence was that the agent was on the platform when the decision to turn the gate was made. The testimony, including that of the man who turned the gate, was that the agent authorized the signal, except the testimony of a witness for the defendant, who was discredited by an express finding of the jury. That the signal was rightfully set against the freight train was determined by special findings already considered.

Little need be said with reference to the defense that the plaintiff's engineer did not use due care to ascertain if a train were approaching on the defendant's track. As stated before, each train was visible to employees of the other after they came from behind the hills on opposite sides of the station. The special findings were to the effect that after the passenger train came in sight of it, the engineer saw the freight train; that from a point 1,000 feet from the crossing up to the crossing the engineer's view of the freight train was unobstructed; and that within that distance he looked for the freight train. The testimony of the engineer of the passenger train was not very clear with respect to his observation of the freight train. The jury were authorized to infer, however, that while he did not look at or watch the freight train in the sense that by special act he gave it monopoly of his eyes, he was visually cognizant of the movement of the freight train. He testified that after stopping for the crossing he looked, and that the gate was thrown against the freight train when it was more

than 800 feet away. The jury found specially that he went on the crossing in the full belief that the freight train would observe and obey the signal to stop displayed by the gate.

The petition pleaded facts showing that the engineer of the freight train was guilty of reckless and wanton disregard of the safety of the passenger train, its passengers, and crew. The jury were not instructed with reference to liability of the defendant for such conduct, notwithstanding contributory negligence on the part of the plaintiff. The findings of fact, however, establish the allegations of the petition. If it were necessary, this court could apply the law, disregard the subject of contributory negligence on the part of the plaintiff, and direct judgment for the plaintiff.

The trial was conducted by able attorneys, skilled in the art of examining and cross-examining witnesses, and skilled in the trial of train-accident cases. Witnesses expressed themselves, not merely in different but in discordant ways, concerning the same subject. In some instances, what the witness really intended to say was left uncertain. Contradictory testimony was given respecting most of the material facts. Accepting, as this court must, the evidence most favorable to the plaintiff, and the inferences from the evidence most favorable to the plaintiff, the findings of fact were sustained by sufficient evidence.

The foregoing covers everything essential to the fixing of liability for the collision on the defendant. Nothing else in the case requires extended discussion. The duty of the plaintiff to exercise extraordinary care toward its passengers was not owed to the defendant, and the principles governing the liability of a carrier to its passengers do not apply to the accountability of the defendant to the plaintiff. The letters and telegrams passing between the officials of the two companies authorized the plaintiff to settle personal-injury claims for the company at fault, and the law implied a promise to reimburse the plaintiff if the defendant were liable. Physicians' and surgeons' bills were incidental to the personal-injury claims of passengers. As soon as the personal-injury claims were settled, the duty to reimburse the plaintiff arose, and interest on the amount was properly allowed.

The judgment of the district court is affirmed.

## FINDINGS OF FACT.

### FIRST SERIES.

"Q-1. After said passenger train which was approaching Moody crossing had reached a point just past the hill, which was approximately 2,200 feet northwest of said crossing, did the engineer on said passenger train see the freight train of defendant approaching said crossing from the southwest? A. Yes.

"Q-2. Did the engineer on said passenger train again look for said freight train at any time after he had reached a point within 1,000 feet of said crossing and before his said engine went onto said crossing? A. Yes.

"Q-3. If you find that the engineer of the passenger train either did or did not look (at any time after he had reached a point within 1,000 feet of the crossing and before his engine went onto said crossing) for the approaching freight train, state what there was, if anything, to have prevented him from seeing said approaching freight train at any point within said distance. A. Nothing.

"Q-4. What distance was the engine of the passenger train from the crossing at the time that Walter Geisy, the hackman, had finished turning the gate against the defendant's freight train? A. 20 to 30 ft.

"Q-5. What distance was the engine of the defendant's freight train from the railroad crossing when Walter Geisy, the hackman, had finished turning the gate from its normal position against the plaintiff across the track of the defendant company? A. 800 to 1,000 ft.

"Q-6. When the engine of the passenger train was within a distance of 100 feet from said crossing, at what rate of speed was it moving? A. 2 to 4 miles per hour.

"Q-7. At the rate of speed that you find said passenger train to be moving, in your answer to question No. 6, in what distance could it have been stopped by applying the air brakes in emergency? A. 10 feet.

"Q-8. At what rate of speed was plaintiff's passenger train moving at the time said gate was turned from its normal position against defendant's train across the track of the defendant? A. 4 miles per hour.

"Q-9. At what rate of speed was defendant's freight train moving at the time said gate was turned from its normal position against it and across defendant's track? A. 15 to 18 miles per hour.

"Q-10. Was Walter Geisy, the hackman, informed, before turning the gate against the defendant's freight train, that by so doing in all probability he would cause a wreck? A. No.

"Q-11. Was the passenger train of the plaintiff brought to a full stop prior to going over said crossing on October 13, 1909? A. Yes, approximately so.

"Q-12. After the gate had been turned from its normal position against the M. K. & T. train to a position against the approaching freight train of the Missouri Pacific Railway Company, was there anything to have prevented those in charge of the plaintiff's engine from discovering said approaching train, and knowing that it either was not

going to stop before crossing over said crossing, or could not stop before doing so? A. Yes, no warning.

"Q-13. After the crossing came within the range of vision of the engineer on defendant's freight train, could he, with the appliances at hand, have brought his train to a stop before reaching the crossing if the gate at any time had been turned against said freight train when the engine was within 800 to 600 feet of the crossing? A. Yes.

"Q-14. After the gate had been turned from its normal position to a position across the defendant's track, could the freight train have been stopped before reaching the crossing? A. Yes.

"Q-15. At what rate of speed was the defendant's freight train moving when it reached said crossing? A. 15 to 18 miles."

SECOND SERIES.

"1. Did the Missouri Pacific employees on train No. 192 have their train under full control at any time after the engineer released his brakes at a point 600 feet or more before he arrived at the crossing at Moody station? A. No.

"2. From the time the Missouri Pacific train came out of the cut 4,200 feet from the crossing until it arrived at the crossing, did the employees on said train have a clear and unobstructed view, had they looked, of the M. K. & T. train, while it moved from a point near mile post 56 to the crossing? A. Yes.

"3. Did the engineer of the M. K. & T. train go upon the crossing in the full belief and assumption that the employees of the Missouri Pacific train would approach with their train under full control and would observe and obey the signal displayed by the gate to stop? A. Yes.

"4. Could the Missouri Pacific employees on train No. 192 have stopped their train in time to have prevented the collision after they saw plaintiff's train entering upon the crossing if they had operated their train *under full control* at the time they saw the M. K. & T. train go upon the crossing? A. Yes.

"5. Did plaintiff's employees make every possible effort to get the passenger train off the crossing after they saw that defendant's freight train was beyond control? A. Yes.

"6. Did the M. K. & T. employees have their train under control at all times as they approached said crossing from a point about 175 feet northwest of the crossing? A. Yes.

"7. Do you find the Missouri Pacific Railway Company, defendant herein, negligent in the following particulars, which negligence was the proximate cause of the collision:

"(a) Failure of the Missouri Pacific Railway Company to make proper and sufficient rules for the safe operation of its trains on approaching crossings? A. No.

"(b) Release of the brakes by the Missouri Pacific employees in charge of train No. 192, causing them to lose control of their train, when plaintiff's train was in full view approaching the crossing and could have been seen by Missouri Pacific employees had they looked? A. Yes.

"(c) Violation of the rules promulgated by the Missouri Pacific Railway Company to govern their employees in operating trains on approaching crossings?  A. Yes.

"(d) Approaching said crossing by Missouri Pacific train No. 192 at too high speed?  A. Yes.

"(e) Failure of the Missouri Pacific employees to use the reverse lever, sand, and brakes, when by so doing their train could have been stopped before arriving at the crossing?  A. Yes.

"(f) Failure of the Missouri Pacific employees to give warning signals after their train was beyond their control?  A. Yes.

"(g) Release of the brakes by the Missouri Pacific employees, knowing that when they released said brakes their train would be beyond control, and also knowing that the M. K. & T. passenger train was approaching and close to the crossing?  A. Yes."