Don **TOWNSEND** et al., Appellees,

v.

**MELODY HOME MANUFACTURING COMPANY, a Texas Corporation, Appellant.**

**No. 47290.**

Court of Appeals of Oklahoma, Division No. 2.

Sept. 2, 1975.

Released for Publication by Order of the Court of Appeals Oct. 30, 1975.

Bay, Hamilton, Renegar & Lees, Oklahoma City, for appellees.

Charles W. Stubbs, Stubbs, Stiner & Pace, Oklahoma City, for appellant.

BRIGHTMIRE, Judge.

This action arose when Melody Home Manufacturing Company (Melody) reneged on its promise to pay a sales incentive bonus to one of its dealers, T-Bar-W Mobile Homes (T-Bar-W), after the latter had earned it by purchasing nearly one hundred thousand dollars worth of mobile homes in 1972.

T-Bar-W's petition, filed in May of 1973, alleges that it purchased from Melody 14 mobile homes in 1972 in the total amount of $92,732.65, and that these purchases were made pursuant to Melody's bonus plan.[1] Therefore T-Bar-W alleges, it

---

1. The bonus offer was contained in a letter attached to the petition reading:

"DEALER PROFIT SHARING AND BONUS PROGRAM

"Melody Home Manufacturing Company is offering to each of its participating Melody and Timco Dealers the following attractive incentive plan subject to the terms and provisions outlined below.

"The year for computing bonus on eligible purchases will begin on January 1st, 1972 and end on December 31st, 1972. Bonus

is entitled to its "bonus percentage" of 1½ percent of the gross purchases, or $1,390.-99.

Melody answered with a general denial asserting that T-Bar-W did not comply with the terms of the bonus plan and is therefore not entitled to any relief.

The case was tried to a jury in January of 1974. After both parties had introduced evidence and rested, the trial court sustained T-Bar-W's motion for a directed verdict based on the conclusion that Melody had not presented evidence of a defense to T-Bar-W's proved cause of action.

From that ruling and the awarding of attorney's fees, Melody appeals.

Melody, a manufacturer of mobile homes, has its principal office in Fort Worth, Texas. Oklahoma City is the home of T-Bar-W, a partnership that retails mobile homes to the consumer.

Because various interpretations of a phrase used in the bonus offer—"paid for promptly"—developed, Melody says it decided to send a letter to all of its dealers in April of 1972, defining those words to mean that payment must be within 15 days from the date of delivery [2]—a letter which T-Bar-W denies receiving.

percentages are retroactive and are computed on the highest plateau reached in the bonus year.

| When Purchases Exceed | Bonus Percentage |
|---|---|
| $ 60,000.00 | 1% |
| 90,000.00 | 1½% |
| 125,000.00 | 2% |
| 200,000.00 | 2½% |
| 300,000.00 | 3% |
| 400,000.00 | 3½% |
| 500,000.00 | 4% |
| 600,000.00 | 4½% |
| 700,000.00 | 5% |

"Eligible purchases will be mobile homes purchased and delivered between January 1st, 1972 and December 31st, 1972 which bear serial number 22610 and up and must be delivered or picked up and paid for promptly.

"Total purchase for application of bonus percentages shall be the total amount of the mobile home invoice. Purchase of parts, accessories, service or any other merchandise not included on the original mobile home invoice are not eligible for bonus computation.

"Any new Dealer will receive credit for all eligible purchases from the date of his first purchase to the end of the bonus year.

"If a Dealer ceases to be a Dealer for any reason he will receive credit for all eligible purchases prior to such date of termination and will be paid the bonus earned according to the terms and provisions of the program.

"Bonus payment will be made as soon after the close of the profit sharing year as possible following the final verification of total eligible purchases.

"Melody Home Manufacturing Company reserves the right to apply at any time all or any part of the Dealers earned bonus against any obligation of the Dealers which is due Melody Home. If Melody Home has been notified of a default under any financing arrangement with which Melody Home has a repurchase obligation, the date for payment of bonus shall be deferred until such default is cleared.

"Melody Home Manufacturing Company reserves the right to amend or discontinue this program at any time by giving notice of such discontinuance or amendment. Any bonus due the Dealer on eligible purchases at such time would be payable in accordance with the terms and provisions of this program.
"Melody Home Manufacturing Company
s/Maury Owen
Maury Owen, President"

2. The April 10, 1972, letter reads as follows:
"ATTENTION ALL MELODY & TIMCO DEALERS!
"Interpretation of paragraph three of my notification to you of our Bonus Plan (a copy of this notification is enclosed) has become necessary since several controversial situations have arisen in the first quarter of the year which we have just completed.
"My letter states that in order for a purchase to be eligible for rebate at the end of the year, the mobile home must be 'delivered or picked up and paid for promptly.' We have had instances where we were not able to secure floor plan approval for as long as 30 days after the home was ready and therefore could not be delivered. We have also had instances where we did not receive payment from Banks or Finance Companies for up to 45 days after the homes arrived on the Dealers lot. On several occasions drafts were not paid off at the Bank and were returned to us unpaid. I believe you will have to agree that these situations could not be considered to have been 'delivered or picked up and paid for promptly.' For this reason, beginning immediately, the word 'promptly' when applied to delivery or pick up of a home will mean seven (7) days after it is ready. When

It is undisputed that between June 23 and the latter part of November 1972, T-Bar-W purchased 14 mobile home units from Melody for the sum of $92,732.65. The only reason given by Melody for refusing to pay a 1½ percent bonus was that the time lapse between delivery of eight units and receipt of payment ranged from 18 to 35 days. Only six of the purchases were paid for within the 15-day period and these totaled less than the $60,000 minimum required for the bonus.

In this regard, however, it is also uncontroverted that payments to Melody in all eight of the disallowed purchases were made under a "floor plan" arrangement with General Electric Credit Corporation of Oklahoma City (GECC)—a plan Melody itself devised. Under it T-Bar-W placed an order for a mobile home from Melody and Melody contacted GECC to see whether funds were available on behalf of T-Bar-W for the purchase of the unit. If funds were available, Melody received a committal number. When the mobile home was delivered to T-Bar-W, Melody sent an invoice to GECC (and a copy to T-Bar-W) along with a "Manufacturer's Statement of Origin" (M.S.O.). Upon receiving them GECC contacted T-Bar-W for confirmation that it had received and accepted the unit. If the dealer did so confirm then GECC mailed payment for the unit to Melody. T-Bar-W was charged interest commencing three days after the invoice date.[3]

Melody argues that directing a verdict against it was wrong because: (1) an issue of fact existed and (2) the credit company was an agent of T-Bar-W so that the former's slothfulness is imputed to the latter. Moreover, contends Melody, the trial court abused its discretion in the amount of attorney's fees it awarded.

In regard to its first point Melody argues that three factual issues existed for jury resolution: (1) Did T-Bar-W comply "with the terms of the [bonus] contract"? (2) Was the April "amendment of the contract" (the letter defining the word "promptly") binding on T-Bar-W? and (3) If it did not receive the letter, then was a unit "paid for promptly" if payment was delayed for more than 15 days past delivery?

The first suggested issue is not one at all. Melody presented not a scintilla of evidence upon which could rest a finding that T-Bar-W failed to do everything required of it in regard to the delivery of and payment for all 14 mobile homes in question. All of Melody's evidence went to showing delays on the part of GECC—delays which seemed to inhere in procedure Melody insisted be followed. So the fact was and is that T-Bar-W, insofar as it possibly could, fully and promptly complied with the terms of the bonus offer.

■ The second and third suggested issues being related may be treated together. If indeed issues they are, they are not material ones. Regardless of whatever "Banks or Finance Companies" the April letter (footnote 2) refers to, its clear implication and tenor is that the "situations" complained about are those over which the dealer had some control and capability of altering in order to comply with the 15-day promptitude. If it does not then the letter effected simply a cancellation of the bonus

'promptly' is applied to payment, it will mean fifteen (15) days after the home arrives on your lot.

"Because of the possibility of misunderstandings, I am granting 'amnesty' to any and all Dealers who might fit any of the catagories above. However, from this day on the dates will be watched and the Invoice Amount of all homes which fall outside the seven (7) day delivery or the fifteen (15) day payment will be deducted from your total at the end

of the year before the bonus is computed.
"s/Maury Owen
Maury Owen
President"

3. The floor plan arrangement was also subject to a "Repurchase Agreement"—an instrument prepared by Melody and signed by GECC specifying in detail how the latter was to finance the house trailers.

offer, and if a cancellation was intended, it was ineffective because not expressly stated. certain it is we cannot construe the letter as referring to the T-Bar-W situation where the dealer had no control over the finance company and its obligation to fulfill relevant written procedural commitments to Melody. To do so would amount to a renunciation of fair play and extending a helping hand to a situation bearing a close resemblance to inducing a rabbit to advance by dangling an unobtainable carrot in front of it.

What the letter did do, however, was to reveal Melody's realization that its use of the imprecise term "promptly" did not create a definitive condition but a general statement as to expectations. Thus, though the April letter created no fatal barrier to T-Bar-W's bonus entitlements, it did, for clarity's sake, stand in need of an interpretation of Melody's use of "promptly." Perhaps the one recommended by Melody in its brief is as good as any:

> "*PROMPTLY*—verbial form of the word prompt which means ready and quick to act as occasion demands. *Missouri K & T Railroad Company vs. Missouri Pacific Railroad Company,* 103 Kansas 1, 175 P. 97, 103. The meaning of the word depends largely on the facts in each case. *Irvin vs. Koehler,* CCANY 230 F. 795, 796; *Stovel & Strickland vs. McBrayer,* 20 Ga.App. 93, 92 S.E. 543."

To repeat an earlier observation, the facts of this case admit of but one finding and that is that at all relevant times T-Bar-W was "ready and quick to act as occasion" demanded.

■■■ Melody's second proposition— that the credit company was an agent of T-Bar-W—is based on the idea that the payments made by GECC to Melody were for T-Bar-W's benefit resulting in GECC being an agent of the latter.

However, the trial court's adjudicatory reasoning did not involve an agency rela- tionship as demonstrated by the following conclusions of the trial court:

"1. Evidence is uncontradicted that the Defendant set up the agreement between G.E.C.C. and in relation to the floor-plan as to how the payments for this merchandise was [sic] to be paid for and who was to make the payments.

"2. The Defendant looked to G.E.C.C. for the payment of these mobile homes.

"3. The Defendant knew that the General Electric Corporation would be doing the paying because of the prior arrangement that the Defendant theirselves [sic], had set up in setting up this whole negotiation. That was a three-way triangle from the start.

"4. That when payments were slow, the Defendant, by their [sic] own testimony, only notified, and the only person they talked to was the people that was to pay them, that was the G.E. Credit Corporation. And by their own testimony never made any complaint whatsoever to the Plaintiff as to any slow payment by the testimony of Mr. Owen, who testified on behalf of the Defendant.

"5. The Defendant under the facts in this case is estopped by law to use their own acts and their own agreement to keep from paying under this bonus plan."

Neither these conclusions, with which we agree, the pleadings, nor the record otherwise contain any hint that an agency issue was presented in the trial court. And frankly we have difficulty seeing how it could successfully have been. In the first place GECC appears to be more of an independent contractor. But if indeed it could be considered an agent for one of the parties it would have to either be for both or Melody alone in view of the unchallenged control the latter exercised over GECC's method of operation as described elsewhere herein.

■■■ Besides the theory underlying the result reached by the trial court, his judgment may also comfortably rest upon a kindred principle of contract law, namely,

that a party to a contract may not prevent performance of a condition and then claim the benefit of such condition. *Seal v. Carroll*, Okl., 439 P.2d 185 (1968); *Chilton v. Oklahoma Tire & Supply Co.*, 180 Okl. 39, 67 P.2d 27 (1937). The conduct of a party to a contract which prevents or dispenses with performance by the adverse party is equivalent to a waiver of the right to require performance. *Rogers v. Goodwin*, 208 Okl. 110, 253 P.2d 844 (1953). To deny T-Bar-W relief would in effect allow Melody to promulgate a sales incentive program then escape its obligation thereunder by creation of nullifying payment procedure. The method of floorplanning employed—which included controlled timing of payment to Melody—was set up by Melody itself. On its part T-Bar-W confirmed each purchase immediately and gave its consent to GECC to pay Melody.

We therefore hold that the trial court committed no error in sustaining T-Bar-W's motion for a directed verdict. In ruling on the motion the trial court was aware of having to consider as true "all the evidence favorable to the party against whom the motion is directed, together with all the inferences reasonably to be drawn therefrom, and should disregard all conflicting evidence favorable to the movant." *Gwinn v. Payne*, Okl., 477 P.2d 680 (1970); *Brown v. Tulsa Exposition & Fair Corp.*, Okl., 429 P.2d 767 (1967). And this he did. No "material" factual issue existed and under the facts T-Bar-W was entitled to judgment as a matter of law.

■ Finally we find no error in the trial court awarding T-Bar-W's counsel $1,250 in attorney's fees pursuant to 12 O. S.1971 § 936.[4] Melody asserts that imposition of the award was "in the nature of a punishment" for Melody and that the court was "trying to imply to the Defendant you are not entitled to defend any of these cases regardless of what issues you might have in the case." In support of this non sequitur, Melody quotes a remark the trial judge made while ruling on the matter of attorney's fees.

"I think these things are also true in insurance cases. I have a lot of cases up here where insurance cases won't pay a three, four hundred dollar claim. They say, 'Sue me.' I think those things have something to do with setting a fee in a case like this. I think from the evidence and the testimony in this case that your client did not have any defense to the lawsuit to begin with. And to arbitrarily say, 'Okay, we are not gonna pay it. You sue me.' And your lawyer gets a small percentage, spent eight hours in court, three hundred dollars, four hundred dollars, that doesn't make sense to me."

While this obiter dicta may not have been absolutely necessary, it was appropriate under the circumstances, not as a prelude to punishment as Melody imagines, but as a pointed reminder that the impulsive "Okay, sue me" attitude in regard to small claims nowadays usually carries with it the potential of having to pick up the entire litigation tab without benefit of a judicial discount. After reviewing this record we get the same impression the trial judge got —that Melody had so little substance to its position as to suggest an intentional welshing on its deal with the thought in mind that it likely would not be sued for such a small amount. Perhaps it is fortunate for Melody that T-Bar-W did not seek exemplary damages.

■ The hearing on attorney's fees took place on February 1, 1974, The court first heard evidence from T-Bar-W's counsel,

---

4. 12 O.S.1971 § 936 reads:
"In any civil action to recover on . . . [a] contract relating to the purchase or sale of goods . . . unless otherwise provided by law or the contract which is the subject to the action, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs."

who requested attorney's fees in the amount of $1,349. That was calculated by the amount of office time (23¾ hours) and court time (11½ hours) times the hourly rate of $35 for office time, $40 for court time.

Two attorneys, unrelated to the case, testified for T-Bar-W as expert witnesses. The first estimated that considering only the time spent, a reasonable fee would be $1,410 (at the hourly rate of $35 for office time and $50 for court time). He further testified that if one considered the time spent in view of the amount of the judgment, $1,250 would be a more reasonable figure. The second attorney opined that a reasonable fee under the circumstances would be $2,500.

Aside from the evidence received by the trial court on the subject of attorney's fees, the record otherwise contains evidence sufficient to satisfy us that the fee awarded was proper and reasonable. The rigor of the defense was exceeded only by the weakness of its substance—an intense resistence that has continued right on down to the wire on this appeal. We therefore approve the attorney's fee awarded and reject as wholly uncalled-for Melody's charge that in awarding it "the Court seems to be wanting to get even or in some method inflict a punishment upon this Defendant."

NEPTUNE, P. J., and BACON, J., concur.