**F I L E D**

PUBLISH

**February 16, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MURPHY OIL USA, INC.,

    Plaintiff-Appellee/Cross
Appellant,

v.

LAWRENCE WOOD; TRIVENTAL,
INC.,

    Defendants-Appellants/Cross-
Appellees,

and

RANDALL RAMEY,

    Defendant - Appellee.

Nos. 04-6183 and 04-6239

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 03-CV-42-C)**

---

Robert W. Dace (and Sheryl N. Young, with him on the brief), McAfee & Taft, A
Professional Corporation, Oklahoma City, Oklahoma, for Plaintiff-Appellee/Cross
Appellant.

Robert N. Sheets (Heather L. Hintz, on the briefs, and Lyndon W. Whitmire, with
him on the briefs), Phillips, McFall, McCaffrey, McVay & Murrah, P.C.,
Oklahoma City, Oklahoma, for Defendants-Appellants/Cross-Appellees.

Before **SEYMOUR**, **EBEL**, and **KELLY**, Circuit Judges.

**KELLY**, Circuit Judge.

Defendant-Appellant/Cross-Appellee Trivental, Inc.[1] ("Trivental") appeals from a judgment as a matter of law ("JMOL") in favor of Plaintiff-Appellee/Cross-Appellant Murphy Oil U.S.A., Inc. ("Murphy") on (1) Murphy's breach of contract claim; (2) two of Trivental's breach of contract counterclaims; and (3) Murphy's breach of fiduciary duty claim. Lawrence Wood, an officer of Trivental, also appeals the district court judgment that he lacked standing to pursue his individual counterclaims. Finally, Trivental appeals the court's award of attorney's fees and pre-judgment interest in favor of Murphy.

Murphy cross-appeals from a judgment on a jury verdict in favor of Trivental with regard to a third breach of contract counterclaim. Murphy also cross-appeals the district court judgment denying punitive damages. Finally, Murphy cross-appeals the determination that Murphy was not entitled to attorney's fees with regard to Trivental's counterclaims. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm in part, and reverse in part.

---

[1]Defendant Wood's appeal focuses on the district court's rejection of his standing to pursue his individual tort claims. This is addressed below.

- 2 -

## Background

Murphy owns and operates gasoline service stations, including those in Wal-Mart locations, throughout portions of the country. Murphy and Trivental entered into a contract ("General Contract"), effective January 1, 2000, whereby Trivental was to perform work as the general contractor for the building of gasoline stations, four of which were relevant to the litigation in this case. Before the construction of any individual gas station, Trivental and Murphy would enter into a particularized contract ("Specific Contract") that would outline the scope of work, contract price, payment terms, completion date, and other matters not addressed in the General Contract relevant to that particular station. Trivental and Murphy entered into Specific Contracts to build four gas stations, in these locations: New Iberia, Louisiana; Hugo, Tulsa, and Oklahoma City, Oklahoma.

Murphy sued Trivental claiming that Trivental breached its contract by failing to pay its subcontractors for work done on the Oklahoma City gas station. See Aplt. App. at 82. Murphy further argued that Trivental had misappropriated trust funds paid by Murphy, intended for the benefit of the subcontractors, in violation of Okla. Stat. Ann. tit. 42, §§ 152, 153. Trivental counterclaimed, arguing that Murphy had failed to fully compensate Trivental for "extra work" performed and materials supplied at the New Iberia, Hugo, and Tulsa stations.

See Aplt. App. at 88.

These counterclaims were submitted to the jury. The claims relating to the Tulsa and Hugo stations were decided under Oklahoma law, while the claim relating to the New Iberia station was decided under Louisiana law. Following deliberation, the jury awarded Trivental damages in the following amounts: (1) $37,500 for the Tulsa station, (2) $40,000 for the Hugo station, and (3) $137,500 for the New Iberia station. See Aplee. Br. 5-6.

Over a month later, the district court partially set aside the jury verdict in favor of Trivental, and granted JMOL for Murphy on the counterclaims relating to the two Oklahoma stations, ruling that Trivental had accepted negotiated amounts of money and therefore waived any right to pursue the remainder allegedly due on the contract. Aplt. App. at 478-9.[2] The district court had not instructed the jury on waiver. See id. at 1634 ("There is no instruction on waiver on breach of contract claims."). As such, Trivental was awarded $137,500 in damages.

Next, the court entered JMOL on Murphy's breach of contract claim, awarding Murphy $80,702.06 for actual damages, and an additional $9,074.76 in prejudgment interest. The district court also entered JMOL on Murphy's breach of fiduciary duty claim, ruling that the managing officers of Trivental, Defendants

---

[2]The district court ruled that Louisiana law governed the New Iberia station counterclaim, and waiver did not apply there. Aplt. App. at 478, n.*.

Wood and Ramey, could be held personally liable for breach of trust. The district court also granted Murphy attorney's fees in the amount of $77,040.75.

On appeal, Trivental argues that the district court erred in (1) setting aside the jury's verdict and entering JMOL in favor of Murphy on the Oklahoma stations, (2) reserving the defense of waiver, (3) granting JMOL in favor of Murphy on its breach of fiduciary duty claim, (4) improperly shifting the burden of proof on damages to Trivental, (5) failing to instruct the jury on Trivental's "first breach" theory, (6) failing to instruct on Trivental's fraud and constructive fraud claims, and failing to grant it a new trial, (7) holding that Wood lacked standing to proceed on fraud and tortious interference claims, (8) awarding attorney's fees to Murphy, and (9) awarding prejudgment interest to Murphy. In its cross-appeal, Murphy argues that the district court erred in (1) not granting Murphy JMOL or a new trial or remittitur on Trivental's contract claim on the New Iberia station, (2) failing to submit Murphy's laches defense to the jury, (3) not granting Murphy JMOL and awarding it punitive damages on its breach of fiduciary duty claim, and (4) not awarding Murphy attorney's fees in connection with Trivental's counterclaims.

## Discussion

A.    Trivental's Appeal (04-6183)

1.      Waiver

Trivental argues that sufficient evidence of Murphy's breach of contract existed, and therefore the district court erred in setting aside the jury verdict on its counterclaims. Trivental further asserts that the district court erred in granting JMOL on waiver grounds, contending that waiver presents a question of fact for the jury.[3] Murphy argues that the court's ruling was proper because Trivental voluntarily and intentionally accepted partial payment pursuant to a negotiated contract modification and thereby waived its right to claim the remainder.

When a district court sits in diversity, it is required to apply the most recent statement of applicable substantive state law as pronounced by the particular state's highest court. See Phillips v. New Hampshire Ins. Co., 263 F.3d 1215, 1218 (10th Cir. 2001). On appeal, we use the "normal federal standards of appellate review to examine the district court's decision process." Id. (internal citations and quotations omitted). Thus, we review a district court's decision on a motion for judgment as a matter of law *de novo*, applying Oklahoma law. Tanberg v. Sholtis, 401 F.3d 1151, 1156 (10th Cir. 2005). This court applies the same standard as that applied by the district court. See Cummings v. Gen. Motors, Corp., 365 F.3d 944, 949 (10th Cir. 2004).

---

[3]Trivental also argues that the district court's setting aside the verdict resulted in misleading jury instructions and denied it the right to trial by jury. In view of our reversal on other grounds, we need not address this issue.

The Federal Rules of Civil Procedure allow for JMOL, "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). As such, JMOL is appropriate only if "the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." See Cummings, 365 F.3d at 949.

Here, Murphy raised the defense of waiver in its answer to Trivental's counterclaim, and it was an issue identified in the pretrial order. Aplt. App. at 68, 83. Murphy sought JMOL on its waiver theory. Aplt. App. at 1576-77. The district court reserved ruling on it. Id. at 1577. Apparently later, at a jury instruction conference, the court indicated it was inclined to accept Murphy's waiver theory as a bar to Trivental's breach of contract counterclaim regarding the Oklahoma stations. Id. at 716, 813. However, it wanted a written response from Trivental. Ultimately, the court submitted those breach of contract counterclaims without any instruction on waiver to the jury. Id. at 716.

Thereafter, before entering judgment on the jury's verdict, the district court granted JMOL in favor of Murphy on the waiver defense and set aside the jury's verdict on those claims. In post-judgment motions, Trivental argued that Murphy had never preserved waiver for jury consideration because Murphy failed to request an instruction. Aplt. App. at 619. In response to Trivental's post-

judgment motions, Murphy stood on its entitlement to JMOL, and argued that it was entitled to JMOL before the case was submitted to the jury. Aplt. App. at 687-88. This argument, however, ignores the plain language of Fed. R. Civ. P 50(b), which provides: "If, for any reason, the court does not grant a motion for judgment as a matter of law . . . the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b).

In Oklahoma, waiver is the voluntary and intentional relinquishment of a known right. Barringer v. Baptist Healthcare of Okla., 22 P.3d 695, 700 (Okla. 2001). As such, the doctrine of waiver focuses on the intention of the party against whom the waiver is asserted; that is, the party must have the intent to waive its right. Id.; Bay Petroleum Co. v. May, 264 P.2d 734, 736 (Okla. 1953). In cases of contractual waiver, the agreement must be founded upon valuable consideration. See Smith v. Minneapolis Threshing Mach. Co., 214 P. 178, 180 (Okla. 1923).

Waiver can occur both expressly and implicitly. Barringer, 22 P.3d at 701. When the evidence concerning waiver is conflicting, or when more than one reasonable inference may be drawn from the evidence, the existence or non-existence of waiver is a question of fact for the jury. See id.; see also Kincaid and Assoc. v. Black Angus Motel, Inc., 983 P.2d 1016, 1021 (Okla. 1999); Bay

Petroleum, 264 P.2d at 736; Skelly Oil Co. v. Funk, 174 P.2d 241, 242 (Okla. 1946); Smith, 214 P. at 181. It is only where there is an express, knowing, and willing waiver that the issue becomes a question of law for the court. Barringer, 22 P.3d at 701; Smith, 214 P. at 181.

In this case, Murphy argues that the district court's waiver holding was appropriate because Trivental "voluntarily and intentionally accepted money paid pursuant to negotiated change orders," but never informed Murphy of its intent to sue for additional money. This argument proves too much. In order to show an express waiver, there must be actual evidence that Trivental waived its right to full payment. Smith, 214 P. at 180-81. Murphy is unable to make this showing. Upon thorough review of the record generally, and the General Contract, Specific Contracts, and change orders particularly, there is simply no evidence that Trivental expressly waived its rights to the remainder of the contracted for price. See e.g., Aplt. App. at 3971 (listing costs for the Tulsa station).

As such, Murphy must show an implied waiver. Implied waiver can be shown by conduct which warrants an inference of an intent to relinquish. Barringer, 22 P.3d at 701. In order to waive a legal right, though, there must be a "clear, unequivocal and decisive manifestation of the party's relinquishment of the right." Id. Here, the change orders themselves distinguish between the original contract price and the prices associated with the changes, and then add

the two at the end of the change order. Aplt. App. at 3971-72. Murphy insists that Trivental's request for full payment, yet acceptance of only partial payment pursuant to the change orders submitted by Murphy, establishes as a matter of law that Trivental intended to relinquish its right to full payment. We do not think that this evidence ineluctably demonstrates a clear and unequivocal manifestation of Trivental's intent to relinquish its right to full payment. See Barringer, 22 P.3d at 701.

Murphy's position overlooks the factual dispute regarding whether Trivental implicitly waived its rights to full payment. First, there was testimony, albeit from Mr. Wood, that partial payments from Murphy were accepted due to Murphy's inability to pay the full amounts as a result of the number of change orders it was receiving. See Aplt. App. at 1361. Then there was testimony that Trivental relied on promises by Murphy representatives that once Murphy was more stable financially, full payment would be made by adding on to future projects. Id. at 1360-62.

Finally, Mr. Wood testified that the only reason he accepted partial payments on behalf of Trivental was that he was assured in a March 9, 2001 meeting by Murphy representative Kevin Roussel that Trivental ought to accept the partial payment, because "[w]e're going to give you so many jobs you're not going to have to work for anybody else and there will be money in those jobs to

make up what you're going to [lose by accepting partial payment]." <u>Id.</u> at 1455.

The jury verdict on these claims should be reinstated notwithstanding that a factual dispute existed as to waiver, and no waiver instruction was given the jury. Initially, as Trivental objected to an instruction on waiver, the court told Trivental that there was no jury instruction on waiver. Aplt. App. at 1634. Murphy failed to object to **any** instructions, including the lack of an instruction on waiver, given to the jury on Trivental's breach of contract counterclaims, apparently relying on its motion for JMOL. <u>Id.</u> at 1635-37. It now argues that it was not required to request a waiver instruction because the district court indicated that it would rule in Murphy's favor on the waiver defense. Aplee. Br. at 28; Aplt. App. at 478, 687; Fed. R. Civ. P. 51(a)(1). We disagree.

Given the district court's decision to submit Trivental's breach of contract counterclaims to the jury (and effectively deny Murphy's JMOL motion at the time under Rule 50(b), *supra*), it was incumbent on Murphy to object to the instructions as incomplete (lacking Murphy's affirmative defense of waiver) and to provide a waiver instruction. Fed. R. Civ. P. 51(d)(1)(B); <u>Royal Maccabees Life Ins. Co. v. Choren</u>, 393 F.3d 1175, 1179 (10th Cir. 2005) ("Absent a proper objection, a party's argument is deemed waived.") (internal citation omitted). Murphy did not object. Aplt. App. 687 ("Murphy is not claiming error in failing to instruct the jury concerning waiver."). Having stood on the strength of the

waiver evidence, even though the district court submitted the claims to the jury, it may not now claim that it is entitled to a retrial with a proper waiver instruction. Had the district court merely granted JMOL in Murphy's favor on this issue and we reversed, there is no question that a trial on the breach of contract counterclaims with a waiver instruction would be appropriate. But that is not what occurred here–the breach of contract counterclaims were tried to the jury, and no objection was made to the failure to instruct on waiver.

2. <u>Breach of Contract and Assigned Contractual Rights - Tulsa and Hugo stations</u>

The district court granted Murphy JMOL on its claims that Trivental breached the General Contract and contracts of subcontractors assigned to Murphy. Trivental argues that the court erred in not allowing these issues to go to the jury, and in failing to instruct the jury as to its "first breach" defense. We address each argument in turn.

It is well settled in Oklahoma that a party to a contract who prevents or hinders performance thereof cannot seek performance by the other contracting party. See <u>F.D.I.C. v. Everett A. Holseth & Co.</u>, 36 F.3d 1004, 1007 (10th Cir. 1994); <u>Dayton Hudson Corp. v. Macerich Real Estate Co.</u>, 812 F.2d 1319, 1323 (10th Cir. 1987); <u>Townsend v. Melody Home Mfg. Co.</u>, 541 P.2d 1370, 1374 (Okla. Ct. App. 1975). This is the so-called "first breach" defense.

First, Trivental's failure to pay its subcontractors constitutes a breach of the

General Contract with Murphy. Trivental contends that Murphy's breach of contract regarding the Tulsa and New Iberia projects precipitated its breach. Both the General Contract and the Specific Contracts reference and incorporate each other. See Aplt. App. at 4038 (The General Contract provides that "Prior to the commencement of any work under the GENERAL CONTRACT, the parties will enter into a SPECIFIC CONTRACT to cover matters such as the scope of the work, contract price, terms of payment, completion date, and other matters not provided herein . . . .") (emphasis in original); see also id. at 4022 (The Oklahoma City Specific Contract, like all the others provided in the record, provides that the "[c]ontractor shall furnish the materials, labor [etc.] . . . necessary to construct and finish expeditiously, in a workmanlike manner and in accordance with the . . . documents hereinafter listed . . . [including the] General Contract No. 2005-05."). The parties have treated the contracts together and so do we.[4]

---

[4]The dissent apparently rejects the concept of the General and Specific Contracts forming an interrelated "exchange of promises," see Restatement (Second) of Contracts, § 237 (1981), through referencing and incorporating each other. The general contract covers "work performed at Murphy facilities," Aplt. App. 4034, and the entire course of performance dictates that the projects were interrelated. Not only is this consistent with the reality of the construction business, but also the evidence adduced at trial. See Aplt. App. at 931-34, 942-43, 979-80, 4022, 4038. While the three Specific Contracts and the General Contract may be "separate" in some attenuated or formalistic manner, we are reminded that "[t]he form of the agreement is not controlling, and the actual bargain of the parties is not to be determined merely by reference to such criteria as whether . . . separate promises are contained in a single writing or in separate writings." Restatement (Second) of Contracts § 231, cmt. d.

Trivental presented evidence that its inability to pay the subcontractors from which this breach of contract claim derived resulted directly from the debt Trivental incurred for the extra work that it was required to perform in Hugo, New Iberia, and Tulsa. Aplt. Br. at 41-42; Aplt. App. at 1409-1410. Trivental has also presented evidence that Murphy promised to pay Trivental for this extra work. Aplt. App. at 1409-10. It should be noted, of course, that the jury did find that Trivental was entitled to compensation from Murphy for extra work performed at those stations, and therefore this evidence could support a jury finding that Murphy's breach of the contract in not paying with regard to these three stations constituted a "first breach" of the Oklahoma station contract. See Townsend, 541 P.2d at 1374-75. As such, the district court erred in refusing to submit Murphy's breach of contract claim, and Trivental's "first breach" defense, to the jury.[5]

Murphy also claims that it is entitled to the damages based on an assignment of the claims subcontractors had against Trivental. The district court agreed, granting Murphy JMOL on the issue. Aplt. App. at 475. It is true that

---

[5]The dissent contends that as Murphy's breach pre-dated the Oklahoma City station contract's formation, it "would mean that Trivental already had a defense to its failing to pay" the subcontractors before entering into the Oklahoma City contract. Dissent at 6. But Trivental would not have had any notion that it had a "defense" to its breach with regard to the subcontractors at the time of the Oklahoma City contract's formation, because it still believed that Murphy was going to pay for the extra work as promised.

- 14 -

Murphy secured a valid assignment of claims from various subcontractors,[6] for

Oklahoma law is clear that the lien statutes are cumulative, i.e., they do not

preclude aggrieved parties from pressing alternative claims, such as breach of

contract.  See Wyant v. Davidson & Case Lumber Co., 49 P.2d 151, 154 (Okla.

1935) ("[T]his court has repeatedly held that the remedy provided by statute in

this state for foreclosure of mechanic's or materialman's lien is a cumulative

remedy."); see also Love v. Caylor, 227 P. 98, 98 (Okla. 1924) ("The plaintiff

was not required to foreclose his lien and exhaust his remedy in that manner

before he could maintain a personal action against the defendants to recover the

amount of this indebtedness."). But the JMOL cannot be upheld under this theory

either, for the subcontractors' breach of contract claims (validly assigned to

Murphy) implicate Murphy's alleged refusal to pay for additional work, just as

Murphy's own breach of contract claim does, and still present questions of fact

for the jury.  As the assignee, Murphy's rights against Trivental would be subject

---

[6]We note that the purported assignment to Murphy of claims arising under Okla. Stat. tit. 42, §§ 152, 153 is presumed invalid, as the common-law prohibition against the assignment of a tort action, such as breach of a fiduciary duty, obtains unless otherwise provided by statute.  See Dippel v. Hunt, 517 P.2d 444, 447 (Okla. Civ. App. 1973).  While Okla. Stat. tit. 42, §§ 152, 153 do appear to allow the assignment of a valid lienable claim, Murphy surely cannot file a lien against its own property in order to recover against Trivental.  In any case, Murphy does not need to stand on this assignment in order to press the breach of fiduciary duty claim, because the statutory provisions are construed to include owners as beneficiaries of the trust, provided the existence of a valid lienable claim.  See In re Harris, 49 P.3d 710, 715-718 (Okla. 2002).

to any setoffs or counterclaims that Trivental might have against Murphy, and to

defenses as a result of Murphy's conduct. See 6 Am. Jur. 2d § 149 (2d ed. 1999);

Restatement (Second) of Contracts, § 336(4).[7]

### 3.  Breach of Fiduciary Duty

The district court also granted Murphy JMOL on its claim that Trivental

breached its fiduciary duty under Okla. Stat. tit. 42, §§ 152, 153, by spending

money entrusted by Murphy for purposes other than payment of the invoices of

the subcontractors.[8]  Trivental argues that Murphy cannot prevail on this claim

---

[7]The dissent argues for an overly narrow reading of § 336(4), yet despite the thoughts of one federal district court judge in Georgia (sitting by designation in Tennessee) cited by the dissent, the better rule is that explained in State v. Hogg, 535 A.2d 923, 934-35 (Md. 1988) (overruled on other grounds), and amply supported by the authorities listed therein, including two treatises, see 4 A. Corbin, *Corbin on Contracts* § 896, at 527 (1951); Lord, *Williston on Contracts* § 74.47, at 538 (4th ed. 2005), and Winchester v. Hackley, 6 U.S. (2 Cranch) 342, 343 (1805); Pates v. St. Clair, 52 Va. 22, *2 (1854); Restatement (Second) of Contracts § 336(4); Restatement of Contracts § 167(2) (1932) ("an assignee's right against the obligor is subject to all set-offs and counterclaims which would have been available against the assignee if he were the original obligee").  As the court said in Hogg, the alternative position suggested by the dissent attempts to "state[] the universe of rules applicable to assignments" yet fails to "undertake to describe, one way or the other, the effect of antecedent defenses against the assignee." Hogg, 535 A.2d at 935.  Merely because the Restatement (Second) of Contracts illustrated the situation the dissent describes does not mean that the illustration is exclusive.  Indeed, this rule makes perfect sense here given the allegations – Trivental contends that Murphy's conduct resulted in Trivental's breach of the subcontracts.

[8]Section 152 provides, in pertinent part, that the amount "payable under any building or remodeling contract shall, upon receipt by any contractor or subcontractor, be held as trust funds for the payment of all lienable claims due and owing or to become due and owing by such contractors or subcontractors by

- 16 -

because in order to obtain the statutory remedy there must exist a valid lienable claim at the time of the breach. Murphy argues that the breach occurs upon the misapplication of the trust funds, and as liens could have been filed during that time, they are entitled to the statutory remedy.

Oklahoma law is clear that the statutory duty imposed on a general contractor to hold funds in trust for the payment of subcontractors creates a fiduciary relationship between the owner and the contractor. See Okla. Stat. tit. 42, §§ 152, 153; see also In re Harris, 49 P.3d at 716. The fiduciary duty, however, exists only to the extent that there are lienable claims due and owing by reason of a building or remodeling contract. In re Harris, 49 P.3d at 716. It is also well settled that the owner of real property who places trust funds with a general contractor pursuant to the Oklahoma construction trust fund statutes is a beneficiary of the statutory construction lien scheme to the extent of any valid lienable claims arising from the contract between the owner and the general contractor. See In re Harris, 49 P.3d at 716; see also In re Tefertiller, 772 P.2d 396, 397-98 (Okla. 1989).

---

reason of such building or remodeling contract." Okla. Stat. tit. 42, § 152(1) (1968). Section 153 provides, in pertinent part: "The trust funds created under Section 152 of this title shall be applied to the payment of said valid lienable claims and no portion thereof shall be used for any other purpose until all lienable claims due and owing or to become due and owing shall have been paid." Okla. Stat. tit. 42, § 153(1) (1968).

- 17 -

A subcontractor's valid lienable claim arises upon commencement of work or the furnishing of materials pursuant to a subcontract. In re Tefertiller, 772 P.2d at 399; Fleharty & Co. v. Nat'l Loan & Inv. Co., 215 P. 744 (Okla. 1923). From that point onward, this lienable claim remains "inchoate" throughout the construction period and for ninety days following the last furnishing of materials or performance of labor under the subcontract. Id.

If the subcontractor takes no action to enforce the lien, or if the lien is not perfected according to the statutory procedures, then the lienable claim loses "all its vitality and force." In re Tefertiller, 772 P.2d at 399; Bohn v. Divine, 544 P.2d 916, 920 (Okla. 1975) ("Unless the lienable claim was perfected within 90 days of completion of the work or the furnishing of materials, the character of the claim was no longer 'lienable.'"). As such, a subcontractor can only recover under the construction trust fund statutes if "there was a perfected lien at the time [it] brought suit." Bohn, 544 P.2d at 920.

Murphy, as the project owner, is subject to a slightly more nuanced rule. A common sense reading of the statute would not require a project owner to file a lien on his own property, nor is it good policy to require the owner to wait ninety days before paying subcontractors. Okla. Stat. Ann. tit. 42, §§ 152, 153. Furthermore, requiring a project owner to file a lien on his own property could cloud title, even if temporarily, and would require an eventual release of the lien.

Therefore, project owners, who pay subcontractors within the ninety day period in which the subcontractor *could* have filed a lien, should be deemed to have a "lienable claim."

After thorough review of the record, it appears that four claims were paid by Murphy to subcontractors for work performed at the Oklahoma City station before the ninety day period expired. These payments include those to: (1) S. R. Dutch Construction, paid on June 26, 2002 in the amount of $16,002.22; (2) Metroplex Sprinkler, paid on July 2, 2002, in the amount of $7,347; and (3) George Patrick's Plumbing Company, paid on July 9, 2002, in the amount of $2200; and 4) Mustang Electric Company, in the amount of $27,525.[9] See Aplt. App. at 462; see also Aplt. Supp. Br. at 1-2.[10] Thus, the district court's entry of JMOL for Murphy was in error.[11]

---

[9]Only one lien was filed and perfected by a subcontractor, Mustang Electric Company, in the amount of $27,525. See Aplt. App. at 1816-18. From all appearances, Mustang complied with Okla. Stat. tit. 42, § 143's notice and perfection procedures, and the lien claim was timely filed. Id. The relevance of this, if any, will be taken into account by the jury on remand.

[10]It should be noted, of course, that Murphy cannot recover, as a matter of law, under the construction trust fund statutes for any of its other payments to subcontractors if those payments came after those subcontractors' lienable claims became extinguished.

[11]The district court was correct insofar as it found that if Murphy is entitled to any remedy for breach of trust, it can proceed against Trivental's officers individually. See Okla. Stat. tit. 42, § 153(3) ("For purposes of this section, the natural persons subject to punishment shall be the managing officers of [the] corporation. . . .").

- 19 -

Nevertheless, regardless of whether Murphy is allowed to proceed under the construction fund statutes on these four claims, Trivental may still argue (as it has) that it was Murphy's "first breach" that precipitated Trivental's breach of its fiduciary duty to its contractors. That is, a jury question remains as to whether Murphy can show it felt obliged to pay the subcontractors and its conduct vis-a-vis Trivental was not the precipitating cause of the non-payment.

### 4. Mr. Wood's Counterclaims

Mr. Wood, a managing officer of Trivental and a codefendant, appeals the district court decision that he lacked standing to pursue his personal tort counterclaims. The district court was correct. Mr. Wood counterclaimed against Murphy seeking to recover monies he voluntarily advanced to Trivental when Murphy failed to reimburse Trivental pursuant to the alleged Murphy-Trivental oral agreement. Mr. Wood does not have standing to recover what is essentially an obligation owed to Trivental. See J. F. Shea Co., Inc. v. City of Chicago, 992 F.2d 745, 749 (7th Cir. 1993) (holding that employee cannot assert claims of corporation). Indeed, the amounts advanced to Trivental by Mr. Wood are included in and part of the very same damages sought by Trivental itself against Murphy.

Were this any different, presumably anytime a shareholder was required to

contribute capital or make a loan to a cash-strapped corporation, the shareholder could then seek to collect on monies owed the corporation. This would result in liability mayhem. Mr. Wood's recourse, in the absence of any direct relationship with Murphy, would only lie against Trivental. As such, Mr. Wood lacks standing to press his individual claims against Murphy.

5.      <u>Actual and Constructive Fraud</u>

Trivental argues that the district court erred in combining the fraud claims related to the Hugo, Oklahoma station and the New Iberia, Louisiana station under one instruction. Trivental argues that this instruction only states fraud under Louisiana law, and there are "substantial differences" between Louisiana and Oklahoma law. Trivental also argues that the district court erred in failing to instruct the jury on constructive fraud. We address each of these arguments in turn.

While it is clear that a party is entitled to an instruction on her theory of the case if the instruction is a correct statement of law and she has submitted sufficient evidence for the jury to find in her favor, it is certainly "not error to refuse to give a requested instruction if the same subject matter is adequately covered in the general instructions." <u>F.D.I.C. v. Schuchmann</u>, 235 F.3d 1217, 1222 (10th Cir. 2000). We review the district court's decision to give a particular jury instruction for an abuse of discretion. <u>Id.</u> at 1221. The instructions are

considered as a whole *de novo* to determine whether they accurately informed the jury of the governing law. Id. at 1222.

While the fraud instruction in this case does not employ Trivental's preferred wording for fraud in Oklahoma verbatim, the instruction clearly spells out that Murphy could be held liable if it intentionally made misrepresentations in order to obtain "an unjust advantage for one party or to cause a loss or inconvenience to the other." See Aplt. App. at 424. This more than adequately states the governing law of fraud for both Oklahoma and Louisiana. See Schuchmann, 235 F.3d at 1223. As such, the jury instruction on fraud was not error.

With regard to Trivental's claim that the district court erroneously failed to instruct on constructive fraud, we note that constructive fraud does not require an intent to deceive; indeed, negligent or even innocent misrepresentation may provide the basis for a finding of constructive fraud. Faulkenberry v. Kansas City S. Ry. Co., 602 P.2d 203, 206 (Okla. 1979). Nevertheless, in order to recover under a theory of constructive fraud, there must be a "special relationship" between the parties that requires the party charged with constructive fraud to comply with an affirmative statutory duty. Silver v. Slusher, 770 P.2d 878, 882 (Okla. 1988). In its brief, Trivental failed to elucidate the existence of a "special relationship" between the parties that would impose a statutory duty on Murphy

upon which the claim for constructive fraud could possibly stand.  See Aplt. Br. 44-45.[12]  As such, the district court's failure to instruct the jury on constructive fraud was not an abuse of its discretion.

6.      Shifting Burden, Attorney's Fees, and Pre-Judgment Interest

Trivental argues that when the district court required Trivental to prove that the extra work it claimed fell outside the General Contract, it erred in shifting the burden to prove damages from Murphy to Trivental.  Trivental also argues that the district court erred in awarding Murphy attorney's fees.  Finally, Trivental argues that the district court erred in awarding Murphy pre-judgment interest.

We decline to address these arguments, for the basis of these awards, if any, will be reevaluated on remand.

B.      Murphy's Cross-Appeal (04-6239)

1.      Breach of Contract - New Iberia station

On cross-appeal, Murphy argues that the district court erred in neither granting its motion for JMOL nor granting its request for a new trial with regard to the New Iberia station.  As discussed, the district court ruled that waiver did not apply to this contract, because it was decided under Louisiana law.  Trivental

---

[12]Trivental also argues on appeal that the district court erred in not instructing the jury on constructive fraud under Louisiana law.  We decline to reach this argument, as Trivental waived it on appeal by failing to object at trial. Aplt. App. 1630-31.

argues that there was sufficient evidence for the jury to find as it did.

As noted above, JMOL is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position. See Miller v. Eby Realty Group, LLC, 396 F.3d 1105, 1110 (10th Cir. 2005); see also Cummings, 365 F.3d at 951. A motion for a new trial on the ground that the verdict is against the weight of the evidence presents a question of fact, not of law. See Patton v. TIC United Corp., 77 F.3d 1235, 1242 (10th Cir. 1996). Thus, the district court will not be reversed unless the verdict is clearly, decidedly, or overwhelmingly against the weight of the evidence. See id. (internal citations and quotations omitted).

The Louisiana oral modification statute requires that an oral contract, such as the one alleged here by Trivental, that exceeds $500 in price, "must be proved by at least one witness and other corroborating circumstances." See La. Civ. Code Ann. art. 1846 (1985). It is well settled in Louisiana that a party may qualify as its own witness to prove the contract's existence. See Suire v. Lafayette City-Parish Consol. Gov't, 907 So. 2d 37, 58 (La. 2005). The corroborating circumstances need only be general, that is, independent proof of every detail of the agreement is not required. Id. Yet, the corroborating circumstances must come from someone other than the party asserting the agreement's existence. Id.; see also Deubler Elec. Inc. v. Knockers of La., Inc.,

- 24 -

665 So. 2d 481, 484 (La. Ct. App. 1995).

With regard to the first prong, Trivental has presented evidence of an oral agreement. Mr. Wilson has testified that extra work was performed at the New Iberia station, and that it was specifically suggested by Murphy. See Aplt. App. at 1205. Further, Mr. Wilson testified that Murphy required that they keep workers onsite even when the weather conditions precluded meaningful work. Id. at 1203. Mr. Wood testified to these same oral modifications with Murphy, with particular emphasis on the New Iberia station. Id. at 1455-57. As such, it is clear that Trivental provided enough evidence that an oral agreement existed for the jury's consideration.

With regard to the second prong, Murphy argues that Trivental's corroborating circumstances only come from its own representatives, and thereby fail to satisfy the requirement that they arise from someone other than the party. To the contrary, Mr. Buzbee, a Murphy representative, testified that if there were errors in the grading of the New Iberia site, then Trivental would be required to perform extra work. See Aplt. App. at 1244-45. Mr. Buzbee further testified that after negotiation on extra work generally, or a change order specifically, Murphy would agree to pay Trivental (or any contractor) for the extra costs. Id. at 1244-46.

As such, we find that because Trivental has presented corroborating

circumstances of the agreement that do not come from its own representatives, combined with other evidence that does, it has satisfied the two part showing required under the Louisiana statute and case law. See La. Civ. Code Ann. art. 1846; see also Suire, 907 So. 2d at 58. Therefore, the district court did not err in denying Murphy's motions for JMOL or a new trial.

2.      Remittitur

Murphy claims that the district court erred by failing to grant its motion for remittitur. Such a denial is entitled to considerable deference on appeal. We will not disturb this determination absent a gross abuse of discretion. See Sheets v. Salt Lake County, 45 F.3d 1383, 1390 (10th Cir. 1995). We will only find an abuse of discretion if the jury award is "so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial." Id. (internal citations and quotations omitted). As the awarding of damages is traditionally within the province of the jury, and the jury's award of $137,500 certainly does not shock our conscience, we thus affirm the district court's denial of remittitur.

3.      Laches

Murphy argues that Trivental unreasonably delayed in asserting any claim it may have had against Murphy, and that the district court's refusal to instruct the jury on laches amounted to an abuse of discretion. It is well settled in Louisiana

that the time for prescription is "determined by the character which the plaintiff gives his pleadings and that the form of the action governs prescription." Antoine v. Franichevich, 167 So. 98, 99 (La. 1936). According to the Louisiana Supreme Court, "[t]here is no prescription other than that established by legislation." Fishbein v. State, 898 So. 2d 1260, 1270 (La. 2005) (quoting La. Civ. Code Ann. art. 3457, cmt. b). Indeed, the "common law doctrine of laches does not prevail in Louisiana and the legislature may create, shorten, lengthen or abolish prescriptive periods at its discretion." Id. (holding that to the extent that other cases had left open the possibility of laches' applicability, those cases were overruled as inconsistent with the state's statutory scheme); see also Picone v. Lyons, 601 So. 2d 1375, 1377 (La. 1992); Corbello v. Sutton, 446 So. 2d 301, 302 (La. 1984) ("The doctrine of laches has no place in the law of this state.").

While we note that there is some dispute regarding the statutory prescriptive period for breach of contract claims relating to general contractors, the Louisiana Supreme Court has held that "the law is clear that a contractor's claim is prescribed by ten years" rather than the three year period that governs a suit to recover past wages. See Antoine, 167 So. at 99 (noting that suits by contractors who furnish labor and materials in performing jobs for another under a verbal agreement are governed by article 3544, and not article 3538); see also La. Civ. Code Ann. arts. 3544, 3538.

Even if the statute of limitations covering this breach of contract claim were three years though, Trivental would not be barred because less than *two* years elapsed before it filed suit. As such, the district court did not err in refusing to instruct the jury on laches, an affirmative defense that does not exist in Louisiana.

4.      Punitive Damages and Attorney's Fees

Murphy argues that it is entitled to JMOL on its claim for punitive damages from Trivental on Murphy's claim for breach of fiduciary duty. Murphy also argues that it is entitled to attorney's fees relating to Trivental's counterclaims. Given our disposition of the breach of fiduciary duty claims, we need not reach either of these claims.

Conclusion

With regard to Trivental's appeal, the district court's order on JMOL as to (1) the waiver of Trivental's two breach of contract counterclaims, (2) Murphy's breach of contract claim, and (3) Murphy's breach of fiduciary duty claim, is reversed. The district court shall reinstate the jury verdict in favor of Trivental on its two breach of contract counterclaims, and conduct a new trial in accordance with this opinion. The district court's award of attorney's fees and pre-judgment interest to Murphy are reversed, as these matters may be considered if the need

arises in connection with the trial on remand in accordance with this opinion.

With regard to Murphy's cross-appeal, we affirm the judgment on the jury verdict in favor of Trivental on its counterclaim for breach of contract for the New Iberia station, and any recovery of punitive damages or attorney's fees related to Trivental's counterclaims by Murphy may be considered if the need arises in connection with the trial on remand in accordance with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

Trivental v. Murphy Oil, Nos. 04-6183, 04-6239

**EBEL,** Circuit Judge, dissenting in part.


While I agree with much of the majority opinion, I must dissent from the majority's decision to overturn the judgment as a matter of law entered in Murphy's favor on its claim for breach of contract. Because I would conclude that the district court correctly determined that Murphy was entitled as a matter of law to recover on both its breach-of-contract theories, I respectfully dissent from that portion of the majority's opinion.

Murphy's breach-of-contract claim sought to recover from Trivental for money Murphy paid Trivental's unpaid subcontractors on the Oklahoma City project. Murphy asserted two different theories supporting this breach-of-contract claim. First, Murphy asserted that Trivental had breached the General Contract between Murphy and Trivental, which expressly required Trivental to pay all subcontractors on any project it undertook for Murphy. Second, Murphy asserted that, by failing to pay the Oklahoma City subcontractors, Trivental breached its contracts with those subcontractors and that Murphy, as the assignee of those subcontractors, is now entitled to recover from Trivental for its breach. Trivental has never disputed that it failed to pay some of the Oklahoma City subcontractors as required by both the General Contract and the individual contracts between Trivental and the subcontractors. In light of that, Murphy is entitled as a matter

of law to recover, under either theory, for breach of contract.

The majority, however, concludes that a jury should have considered Trivental's defense to these breaches, premised on Murphy's own breach of the Specific Contracts governing the New Iberia, Tulsa and Hugo projects. While Murphy's breach of those three Specific Contracts certainly provides Trivental with a counterclaim that it can, and has, asserted against Murphy, it does not provide Trivental with a <u>defense</u> to <u>its</u> breaching of the General Contract and the contracts Trivental had with its Oklahoma City subcontractors. For this reason, I dissent.

## I.      Trivental's asserted defense.

Trivental asserts a "first breach" defense, arguing that Murphy's earlier breach of the Specific Contracts covering the New Iberia, Hugo and Tulsa projects provides Trivental with a defense to Trivental's later breach of its General Contract with Murphy. And although Trivental never makes the argument on appeal, the majority concludes that this same "first breach" defense should also apply to Murphy's breach-of-contract claim that Murphy asserts as the subcontractors' assignee.

Under such a defense, one party's material breach of a contract will excuse the other party from performing his reciprocal obligations due under that <u>same</u> contract. "[I]t is a condition of each party's remaining duties to render

- 2 -

performance to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."  Restatement (Second) of Contracts § 237 (1981).  The Restatement recognized that, similar to this case, "[i]n many disputes over failure of performance, both parties fail to finish performance, and the question is whether one of them is justified in doing so by the other party's failure."  Id. § 237 cmt. b.

This "first breach" defense, however, applies only when the entities involved are parties to the same contract: "Under the [first breach] rule stated in [§ 237], only duties with respect to the performances to be exchanged under the particular exchange of promises are affected by a failure of one of those performances.  A duty under a separate contract is not affected." Id. § 237 cmt. e; see also id. § 231 cmt. d (noting that "[t]he rules that protect parties whose performances are to be exchanged under an exchange of promises apply only when the promises are exchanged as part of a single contract").

This is where Trivental's "first breach" defense fails.  Trivental seeks to excuse its breach of the General Contract as it pertains to Trivental's paying the Oklahoma City subcontractors, and its contracts with the Oklahoma City subcontractors, by relying on Murphy's breach of other, separate contracts addressing the New Iberia, Hugo and Tulsa projects.

## II. The General and Specific Contracts are not one single contract.

At the outset of the parties' business relationship, Trivental and Murphy entered into a General Contract. That General Contract did not award Trivental any specific construction project, but instead contemplated that any construction project that Trivental undertook for Murphy in the future would be governed both by the terms of the General Contract and by a Specific Contract that addressed the details of that particular project. Each project had its own separate Specific Contract. While the General and Specific Contracts were certainly related, they cannot be considered all one contract. Nor can the separate Specific Contracts be considered together to create a single contract.

Because they are not all one contract, Murphy's breach of the Specific Contracts governing the New Iberia, Hugo and Tulsa projects cannot give Trivental a defense to its own breach of the General Contract. The General Contract required that Trivental pay the subcontractors on all projects. But it did not include a reciprocal provision requiring Murphy to pay Trivental on each specific project. Rather, the Specific Contract governing each particular project addressed Murphy's duty to pay Trivental. Therefore, Murphy's failure to pay Trivental in full for the New Iberia, Hugo and Tulsa projects was a breach of the Specific Contracts governing each of those projects. Murphy's breach would

certainly give Trivental a cause of action to recover against Murphy.[1] But

Murphy's breach of those Specific Contracts would not amount to a breach of the

General Contract.

The result is the same even if we assume that the Specific Contracts each

incorporate the General Contract's terms. In that case, because the Specific

Contracts represent separate contracts between Trivental and Murphy, the fact

that Murphy breached the Specific Contracts governing the New Iberia, Hugo and

Tulsa projects would not excuse Trivental from paying the subcontractors under

the separate Specific Contract addressing the Oklahoma City project.

To conclude otherwise and treat all these agreements as a single contract

produces an anomalous result. Timewise, Murphy breached the Specific

Contracts concerning the New Iberia, Hugo and Tulsa projects before Trivental

---

[1] The General Contract's paragraph 8 reiterates this:

> [Murphy] retains the right to withhold, retain, and/or set off any payments due to [Trivental] in this *or any other transaction or under any contract* such amounts as [Murphy] deems sufficient to protect [Murphy] and its property against any claim by [Trivental's] employees, fabricators, material men, subcontractors, suppliers, and workmen which could or may become a lien or claim against [Murphy] or its property. [Murphy] may at any time pay and discharge such lien or claim and deduct the amount so paid with together with costs and attorney's fees, from any payment then due or thereafter to become due to [Trivental].

This language also further indicates that each project was governed by a separate contract.

- 5 -

and Murphy agreed to undertake the Oklahoma City project.[2]  Viewing all these contracts as one, therefore, would mean that Trivental already had a defense to its failing to pay the Oklahoma City subcontractors before the parties even agreed to the Specific Contract addressing the Oklahoma City project.  I cannot accept such a view of Trivental's and Murphy's business relationship.

### III.  Trivental's breach of the contracts with its Oklahoma City subcontractors.

Even if the General and Specific Contracts between Trivental and Murphy can be considered a single contract, Murphy's breach of that contract by not paying Trivental in full on the New Iberia, Hugo, and Tulsa projects would still not excuse Trivental from paying its Oklahoma City subcontractors the amount Trivental owed on the separate contracts Trivental had with these subcontractors. It is telling that Trivental does not even rely on such a defense in its arguments to this court.  And there is no suggestion that Trivental's contracts with its subcontractors should be considered part of the contractual relationship between Trivental and Murphy.  Moreover, Trivental concedes that it breached its contracts with several subcontractors by failing to pay them in full on that project.

---

[2]  It is difficult to say exactly when Murphy breached those orally modified Specific Contracts.  Trivental asserts that Murphy agreed to pay for extra work Trivental performed on these projects through later payments Murphy would make to Trivental on  future projects.  Nevertheless, it seems safe to say that Trivental considered Murphy to have breached that promise before Trivental ever agreed to construct the Oklahoma City project.

Murphy, therefore, as the subcontractors' assignee, is entitled as a matter of law to recover from Trivental for Trivental's breach of its contracts with those subcontractors.

In nevertheless providing Trivental with a defense, the majority relies upon the Restatement (Second) of Contracts § 336(4) (1981), which indicates that "[a]n assignee's [here Murphy's] right against the obligor [Trivental] is subject to any defense or claim arising from his conduct or to which he was subject as a party or a prior assignee because he had notice." But § 336's comment h further explains that

> [t]he conduct of the assignee [here Murphy] or his agents may, like that of any obligee, give rise to defenses and claims which may be asserted against him by the obligor [here Trivental]. An obligee who is subject to such a defense or claim cannot improve his position by assigning the right to an assignee who is not subject to the defense or claim *and then take a reassignment*.

Id. cmt. h (emphasis added). By way of example, the comment gives this illustration:

> A is fraudulently induced by B, the agent of C, to sell goods to C. C assigns his rights to D, who pays value in good faith and without notice. D assigns to E, who knows of the fraud. A cannot avoid the contract as against E, who succeeded to D's rights. But if E assigns to C, A's power of avoidance will revive.

Id. illus. 15.

Section 336's comment h and illustration 15 do not at all describe what occurred here. Therefore, that section of the Restatement would arguably not

even apply to this situation. But even if this court interpreted § 336(4) to apply beyond the language and example used by comment h and its illustration 15, there is no indication that § 336(4) suggests that an assignee's conduct in the performance of a completely separate contract, occurring prior to the assignment, would give an obligor such as Trivental a defense to its breach of a contract with an assignor who then later assigned his rights to that assignee.

Although there is only minimal case law applying the Restatement's § 336(4), those cases for the most part support this narrow interpretation of § 336(4). In particular, Federal Deposit Insurance Corporation v. Dempster, 637 F. Supp. 362 (E.D. Tenn. 1986), held that "[a] careful reading of Section 336 indicates that the assertion of any defenses against an assignee applies only in instances where the assignee is a party to the underlying contract or where the conduct of the assignee occurs subsequent to the initial assignment but prior to a reassignment." Id. at 366 (emphasis added) (relying on American Training Servs., Inc. v. Commerce Union Bank, 415 F. Supp. 1101 (M.D. Tenn. 1976), aff'd, 612 F.2d 580 (6th Cir. 1979)); see also F.D.I.C. v. Manatt, 723 F. Supp. 99, 105 (E.D. Ark. 1989) (following Berry and holding that litigant could not "assert defenses against the FDIC as assignee based on actions taken by the FDIC in its corporate capacity prior to the assignment"); F.D.I.C. v. Berry, 659 F. Supp. 1475, 1482 (E.D. Tenn. 1987) (following Dempster). In reaching this conclusion,

the district court in <u>Dempster</u> relied on the "general principle of assignment [that] provides that the assignee steps into the shoes of the assignor upon assignment of the interest and takes the assignment subject to the defenses assertable against the assignor." <u>Dempster</u>, 637 F. Supp. at 165-66. But to read Restatement § 336 to permit "actions by the assignee [occurring] prior to the assignment" would improperly subject the assignee "to actions not assertable against the assignor and therefore [the assignee] would have additional characteristics not applicable to the assignor and would not be, as it were, stepping into the shoes of the assignor or taking on the characteristics of the assignor." <u>Id.</u> at 366.

The only contrary case, which does expressly reject the reasoning in <u>Dempster</u> and <u>Berry</u>, <u>State v. Hogg</u>, 535 A.2d 923, 933-35 (Md. 1988), has been overruled on other grounds. See <u>Dawkins v. Baltimore City Police Dep't</u>, 827 A.2d 115, 115-16 (Md. 2003). And Oklahoma courts do not appear to have ever adopted or applied this Restatement provision. In light of this uncertainty, I would not rely upon § 336(4) to grant Trivental a new trial based upon a theory that Trivental never argued to this court.

## IV.   Conclusion

Because I do not think that Murphy's failure to pay Trivental in full on the New Iberia, Hugo, and Tulsa projects gave Trivental any defense to its failure to pay its subcontractors on the later Oklahoma City project, I respectfully dissent

from the majority's decision to reverse the district court's judgment for Murphy, entered as a matter of law, on Murphy's breach-of-contract claim.